**BLACKWELL et al. v. SCOTT et al.**
(No. 7798.)

(Court of Civil Appeals of Texas. Galveston. May 5, 1920. Rehearing Denied June 3, 1920.)

**1. Deeds ⟜114(2)—Description construed to include certain land.**

Description in a deed "the entire point W. or S. W. of Nixon's Bayou that Scott's gin and shipyard was on, adjoining the above-specified tract or parcel of land of 100 acres," *held* construable to describe not only the land lying south of a bay and the specified bayou, and north of a wharf, but the entire body of land lying west and southwest of the bayou and west of a bay down to its mouth, adjoining the 100 acres specified in the deed for a distance of 325 feet just north of the bay.

**2. Deeds ⟜118 — Evidence that description did not embrace land insufficient to support finding.**

In trespass to try title, evidence that description in a deed claimed to be ambiguous did not embrace the land in controversy *held* insufficient to support finding for interveners.

**3. Contracts ⟜153 — Deeds ⟜90 — Instruments should be construed so as to be valid.**

When a deed or contract is reasonably susceptible of a construction which will make it valid and binding, such construction should be given rather than one rendering it void.

**4. Deeds ⟜90 — No patent ambiguity where court can ascertain what parties meant.**

It cannot be said there is a patent ambiguity in a deed if the court, placing itself in the situation of the parties, can ascertain what they meant.

Appeal from District Court, Harris County; J. W. Woods, Special Judge.

Action of trespass to try title by James Scott and others against A. O. Blackwell and others, wherein Genevieve B. Prior and others intervened. From judgment for the interveners, defendants appeal. Reversed and remanded.

Moody & Boyles, of Houston, for appellants. .

Norman G. Kittrell, Jr., of Houston, for appellees.

LANE, J. This is an action of trespass to try title, filed on the 7th day of April, 1917, by the heirs of William Scott seeking to recover from appellants A. O. Blackwell, A. N. McKay, J. G. Kirkland, and F. M. Blackwell a certain tract, point, or peninsula of land lying along the west boundary of a league of land granted to William Scott in 1824, the same being a part of said league. The tract in controversy is variously estimated to contain from 292 to 300 acres of land, and is not known as West Peninsula, in Harris county, Tex., and is all that portion of said point or peninsula lying south of a line drawn from a point marked "Wharf" on the sketch herein to a point on the north bank of Black Duck bay, shown on said sketch.

Genevieve B. Prior and others, claiming the land in controversy under one Thomas Wright, intervened.

. Appellants Blackwell and others answered by plea of not guilty and by pleading the statutes of limitation of three, five, and ten years.

The jury to whom the cause was submitted on special issues found: First, that the William Scott league, of which the land in controversy is a part, was partitioned among the heirs of said William Scott, and that in such partition the land in controversy was allotted to George W. Scott; second, that the description in the deed from George W. Scott to Margaret Hagerman, dated 13th day of September, 1847, did not embrace the land in controversy; third, that Margaret Hagerman, nor any one else under whom appellants claim, at any time held peaceable and adverse possession of the land in controversy, cultivating, using, or enjoying the same for a period of ten consecutive years, or for any other period of limitation.

Upon the evidence and the answers of the jury the court rendered judgment in favor of the interveners, Genevieve Prior and others, for the land in controversy as against appellants and the Scott heirs. From this judgment A. O. Blackwell and others have appealed.

The Scott heirs, original plaintiffs, have not appealed, and are not now before this court.

---

⟜For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

The following facts deduced from the allegations of the pleadings of the parties and the statement of facts, prefaced by the following sketch showing the location of the land in controversy and its boundaries, and its relative position on the ground with reference to other subdivisions of the Scott league, with Nixon's bayou and other things aiding in the description thereof, including the bays, rivers, and other waters forming parts of its boundaries, are sufficient to explain the questions arising on this appeal:

The land in controversy, together with that lying west of Nixon's bayou and north of the line drawn from the point marked "Wharf" to the north bank of Black Duck bay, shown by the sketch, was a part of the portion of the William Scott league allotted to George W. Scott, in the partition of the league between the heirs of William Scott, and is bounded, as shown by the sketch, on the north by Mitchell's bay and Nixon's bayou; on the west and south by the San Jacinto river, sometimes called Buffalo bayou, and which is now the Government or Ship channel; on the east by Black Duck bay and Nixon's bayou, except about the distance of 325 feet intervening between the head of Nixon's bayou and the bank of Black Duck bay, it being joined at this point on the east by the 100-acre tract conveyed by George W. Scott to Margaret Hagerman by deed of date September 13, 1847.

The entire tract as thus bounded is estimated to contain about 410 acres. Scott's gin and shipyard, shown on the sketch, were located on the upper part of this tract prior to the year 1847. On the 13th day of September, 1847, in consideration of $1,000,

George W. Scott executed a deed to Margaret Hagerman (under whom appellants claim) in which the property conveyed thereby is described as follows:

"Beginning at the upper corner of Mary Jane Scott's tract of land, as her part of her father's headright league; thence N. 81° W. 220 varas to a stake on bay; thence north 4° W. 555 varas to a post on Nixon's bayou; thence N. 53° E. 1,597 varas to a stake on Miss A. C. J. Scott's N. E. boundary line; hence S. 33° W. to corner place of beginning—containing 100 acres of land, more or less; also the entire point W. or S. W. of Nixon's bayou that Scott's gin and shipyard was on, adjoining the above-specified tract or parcel of land of 100 acres."

There is no controversy about the location of the 100 acres described in said deed. Its location is shown on the sketch, and is marked "Hagerman 100 acres," but the main matter of controversy is as to what land is covered by or embraced in the descriptive words "also the entire point W. or S. W. Nixon's bayou that Scott's gin and shipyard was on, adjoining the above-specified tract or parcel of land of 100 acres." If by giving these words a reasonable construction it can be held that they refer to the whole of that body, peninsula, or point of land lying west and southwardly of Nixon's bayou down to the mouth of Black Duck bay, which joins the 100-acre tract conveyed in the same deed, such construction would settle the controversy in favor of appellants and would demand a reversal of the judgment rendered and the rendition of a judgment in favor of appellants. On the other hand, if such words cannot, by a reasonable construction, be made to embrace the land in controversy, the judgment for appellees must be affirmed, unless reversed upon appellant's plea of limitation, which will be later discussed.

That the body, peninsula, or point of land mentioned and shown on the sketch as lying west of Black Duck bay and Nixon's bayou is all the land on the league lying either west or southwest of Nixon's bayou is shown by the undisputed facts and must be conceded. It is true that not every part of this body of land lies either west or southwest of Nixon's bayou, but we think, when this body, peninsula, or point of land is considered as a whole, its general location is west and southwest of said bayou, and that it is described with such certainty in the deed from George W. Scott to Margaret Hagerman that it can be definitely located on the ground.

Appellees, who claim under one Thomas Wright, however, contend that the words "also the entire point W. or S. W. of Nixon's bayou that Scott's gin and shipyard was on, adjoining the above-specified tract or parcel of land of 100 acres," describe only that body of land lying north of the line drawn from the point marked "Wharf" on the sketch,

and west of Nixon's bayou; that, if they do not so describe such land, they present an ambiguity in that it might have been intended by their use to describe such land only, or might have been used with intent to describe the whole body, peninsula, or point of land extending along the west bank of Black Duck bay down to its mouth, and that in such case proof of acts of the parties to the instrument and those claiming under them, together with circumstances tending to show what land was intended to be described, might be resorted to to show such intent. They also insist that the evidence offered to prove such intent was sufficient to support the finding of the jury that "the description in the deed from George W. Scott to Margaret Hagerman, of date September 13, 1847, did not embrace the land in controversy."

[1] If proof of such acts and circumstances might be resorted to in this case to show what land was intended to be embraced in the deed, still we do not think the proof offered is sufficient to support the finding of the jury that the land in controversy was not embraced in the deed, or to support the contention of appellees that the point of land conveyed by the deed extended northward from the line drawn from the point marked "Wharf" to the north bank of Black Duck bay. The description, "the entire point W. or S. W. of Nixon's bayou that Scott's gin and shipyard was on, adjoining the above-specified tract or parcel of land of 100 acres," found in the deed under discussion, in our opinion must be construed to describe not only that body of land lying south of Mitchell's bay and west of Nixon's bayou, and north of the wharf, but the entire body of land lying west and southwest of Nixon's bayou and west of Black Duck bay down to its mouth, which adjoins the 100 acres specified in the deed for a distance of 325 feet just north of Black Duck bay. If it does not describe this whole tract, it describes no land whatever with sufficient certainty to pass title thereto.

If we are to accept appellees' contention that the land conveyed was that portion only situated above a line drawn from the west eastwardly, where is this line to be drawn? Why fix it arbitrarily at the point drawn from the wharf to the north bank of Black Duck bay, as appellees would have us do? Certainly there is lying south of this line much land which lies southwest of Nixon's bayou. Why not include this in appellees' supposed point, if we are allowed to guess as to where the south boundary of the land conveyed should be fixed?

When we look to the maps or plats prepared by surveyors who surveyed the land and made such maps, which are found in the statement of facts, we are unable to agree with appellees that the body of land lying north of the line drawn from the wharf east-ward can be reasonably called a point of land at all, and therefore a finding that George W. Scott, in the deed referred to, intended by the words therein used to refer to such land as "the entire point lying S. or S. W. of Nixon's bayou," etc., cannot be sustained.

[2] But, however, should we be in error in holding that such body of land is not a point of land, and look to the facts and circumstances offered in evidence to explain the supposed ambiguity in the deed, we are still unable to agree that such fact and circumstances are sufficient to support the finding of the jury. It is shown by sales made by George W. Scott that in the partition of the Scott league between the heirs of William Scott there was allotted to George W. Scott 2,370 acres, that after he had by his deed of date September 13, 1847, conveyed to Margaret Hagerman the land described therein, he did on the 30th day of October, 1848, convey to one J. F. Overland 251 acres, and that on the 25th day of November, 1848, he conveyed to Thomas Wright (under whom appellees claim, as his heirs) a tract of land described by metes and bounds, estimated to contain not less than 1,635 acres. The field notes given in the deed compute 1,649 acres. This deed also contains the following clause:

"And also all my right in and to the land granted as aforesaid to Wm. Scott, it being well understood that this deed is intended to convey all of my interest in said league of land, to contain not less than 1,635 acres, with the exception of my interest in the homestead, which contains 100 acres."

The 251 acres conveyed to J. F. Overland, the 1,635 acres conveyed to Thomas Wright, and the 100 acres described by metes and bounds conveyed to Margaret Hagerman by George W. Scott aggregate 1,986 acres. When we add to these figures 410 acres, found to be the acreage in the entire peninsular tract, we have 2,396 acres, just 26 acres more than that allotted to George W. Scott.

In 1848, the first year after Margaret Hagerman bought the 100 acres and the other land described in the deed to George W. Scott, there was assessed to Hagerman 500 acres on the Scott league, and thereafter there was assessed to her on said league the following acreage: In 1849, 650 acres; 1850, 1851, 1852, and 1853, 600 acres; 1854, 1855, 1856, 1857, and 1858, 500 acres; in the years 1860, 1862, 500 acres. In 1864 Margaret Hagerman executed a deed to one W. R. Wilson, in which the description of the land conveyed was identical with the description in the deed from George W. Scott to her. In less than one year thereafter, and as early as the 13th day of May, 1865, W. R. Wilson conveyed the same land to F. J. and R. S. Willis, and in his deed thereto he describes the same as follows:

"Also that certain point or peninsula west or southwest of Nixon's bayou, on which was

Scott's gin and shipyard, said peninsula or point heretofore being considered as embraced in the grant or deed from George W. Scott to Margaret Hagerman of the above-described 100 acres, said two last mentioned tracts of land being the same conveyed to me by Margaret Hagerman, by deed recorded in Harris County Record of Deeds, Vol. 1, pages 357, 358, to which reference is made."

On the 20th day of May, 1865, the Willises conveyed the same land to Paul Bremond by the same description as in the deed from Wilson to them.

For the year 1849, the next year after Thomas Wright purchased the 1,635-acre tract described by metes and bounds, he assessed on the Scott league 1,635 acres and no more. The record does not show any further renditions by Thomas Wright, but in 1862, 1863, 1866, 1867, and 1868 Mrs. Cornelia B. Wright, widow of Thomas Wright, assessed for each of said years 1,640 acres and no more. For the years 1869, 1870, 1871, 1872, 1873, 1875, 1876, 1877, 1878, 1879, and 1880 Mrs. Cornelia B. Wright assessed on said league 1,635 acres, and no more.

The interveners who recovered in this suit, and who are now the appellees, are the heirs of Thomas Wright and his wife, Cornelia B. Wright. Their recovery was based upon the second descriptive clause in the deed from George W. Scott to Thomas Wright of date November 25, 1848, in which a tract of land of 1,635 acres is first described by metes and bounds, and which description is followed by a second clause as follows:

"And also all my right in and to the land granted, as aforesaid, to William Scott, it being well understood that this deed is intended to convey all of my interest in said league of land, to contain not less than 1,635 acres, with the exception of my interest in the homestead, which contains 100 acres."

So far as the record discloses, Thomas Wright, nor Mrs. Cornelia B. Wright, nor their heirs, the appellees herein, ever assessed the land in controversy for taxation or paid taxes thereon from the time of the purchase of the 1,635-acre tract described in the deed from George W. Scott to Thomas Wright of date November 25, 1848, nor did they do any other act to indicate that they, or any of them, ever thought that the land in controversy was conveyed by the last-named deed until this suit was filed in April, 1917, 69 years after the execution of said deed; but, on the other hand, it is shown that Thomas Wright, the very first year after he purchased the 1,635-acre tract covered by said deed, rendered it for taxes, and that he rendered no other land on said league. It is also shown that Mrs. Cornelia B. Wright rendered for taxes a tract of 1,635 to 1,640 acres on said league for various years down to 1880, and that she did not render the land in controversy for taxes, and that during all

this time the Hagermans and those claiming under them were assessing land which the evidence shows includes the land in controversy.

There is no act of Thomas Wright, Cornelia B. Wright, nor any of their heirs, prior to the filing of this suit, shown by the evidence that would remotely tend to support a finding that any one of them thought that George W. Scott conveyed the land in controversy to Thomas Wright by his deed of date November 25, 1848, but the facts we have already stated, we think, tend strongly to show that neither Thomas Wright nor Cornelia B. Wright thought that said land was conveyed by said deed. On the other hand, every act of the Hagermans and those claiming through them show that they thought that the land was conveyed to Margaret Hagerman by Scott's deed of date September 13, 1847.

It is insisted, however, by appellees, that it was shown by the testimony of the witnesses Ilfrey, Ashe, and Baker that Hagerman did not claim to own any of the land south of the line drawn from the point marked "Wharf" on the sketch herein to the north bank of Black Duck bay. When the testimony of these witnesses is considered as a whole, it does not support the contention of appellees. It is true that these witnesses did testify that the Hagermans did claim the land north of the line last mentioned, and that they never heard them claim any land south of such line, but Ilfrey, testifying, further said:

"I did not, at any time, have any conversation with Col. Hagerman or his wife, Margaret Hagerman, regarding said property, that is, as to the ownership of said property, at or during the time that Col. Hagerman and wife, or either of them, resided upon said property."

Again:

"I don't know that it is a fact that the Hagermans never occupied, used, or claimed to own any land except the Hagerman 100-acre tract (the west portion of which is now owned by Mrs. McKie) and the land lying between said 100-acre tract and the San Jacinto bay, and extending as far north as Nixon's bayou. I don't know what the facts are with reference to this matter; nor do I know what other lands they claimed to own, or how many acres, or from whom they claimed to have bought it."

Ashe, testifying further said:

"I never at any time had any conversation with Col. Hagerman or his wife, Margaret Hagerman, regarding their property, that is, as to the ownership of said property, at or during the time that Col. Hagerman or his wife, or either of them, resided upon said property."

Baker, testifying, further said:

"I did not, at any time, have any conversation with Col. Hagerman, or his wife, Margaret Hagerman, regarding their property, that is,

as to the ownership of said property, at or during the time that Col. Hagerman or his wife, or either of them, resided upon that property."

The testimony of these witnesses is without any probative force tending to support the contention of appellees, especially so as against the undisputed facts that the Hagermans did assert claim to such land by rendering it for taxes for more than 15 years before it was sold to R. W. Wilson in 1864.

We have been unable to find any evidence which would support the finding of the jury that the description in the deed from George W. Scott to Margaret Hagerman did not embrace the land in controversy.

It is conceded that, if the land in controversy was not embraced in the description in the deed from George W. Scott to Margaret Hagerman, the deed of Scott to Thomas Wright would have had the effect to convey the title to said land to said Wright, had it not been theretofore conveyed to Margaret Hagerman, but, as we have already concluded that the description in the former did embrace said land, such concession becomes immaterial. We are reinforced in our conclusion that the description in the deed from Scott to Hagerman was intended to and did embrace the land in controversy by the testimony of the witness J. T. Ricketts to the effect that he had been acquainted with the peninsula in question since 1873 or 1874, and that it was then called "Hagerman's Point."

[3] As said in the case of Waterhouse v. Gallup, 178 S. W. 776:

"When a deed or contract is reasonably susceptible of a construction which would make it valid and binding, that construction should be given it rather than one which would render it void."

In Standifer v. Miller, 182 S. W. 1149, it is held that every part of a deed must be given effect if possible; and, when all of the parts are harmonized, the largest estate that its terms will permit will be conferred upon the grantee; that an interpretation most favorable to the grantee and against the grantor will be adopted where the language cannot be harmonized, and when two constructions might arise.

[4] It cannot be said that there is a patent ambiguity in a deed if the court, placing itself in the situation of the parties thereto, could ascertain what they meant. There is nothing in the deed from George W. Scott to Margaret Hagerman, nor in the record before us, to show that the land intended to be conveyed thereby was not accurately described, and as the deed on its face bears no ambiguity, and it not appearing, as we think, that any ambiguity or uncertainty arose when the description was applied to the ground, we hold that the deed passed the title to the land in controversy to Margaret Hagerman, under whom appellants claim.

"The office of description in a deed or other writing is not to identify the land, but to furnish means of identification." Holley v. Curry, 58 W. Va. 70, 51 S. E. 135, 112 Am. St. Rep. 944, and cases there cited.

This opinion has already reached such length that, without going into a detailed discussion of the question of limitation, we shall therefore content ourselves by saying that the evidence as a whole is sufficient to support the finding of the jury against appellants on the question of limitation.

From the views above expressed it follows that the judgment of the trial court awarding the land in controversy to appellees should be reversed, and that judgment should be here rendered for appellants, and it is so ordered.

Reversed and remanded.